

AO 106 (Rev 12/03) Affidavit for Search Warrant

# United States District Court

**JUL 21 2015**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

_____**EASTERN**_____ District of _____**CALIFORNIA**_____

In the Matter of the Search of:
A hard drive booked under Clovis Police Department Report No. 09-312, as DD-105, and an AB-1 Acer X1301 computer, serial number BTSCM0Z037005054093000, both CURRENTLY LOCATED AT the Evidence Room of the Sacramento Valley Hi Tech Crimes Task Force (SVHTCTF), 3720 Dudley Drive, McClellan, CA 95652

**APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**

CASE NUMBER:

**2: 1 5 - SW - 0 4 1 1   AC**

I, CHRISTIE HIROTA, being duly sworn depose and say:

I am a Detective with the Sacramento Valley Hi Tech Crimes Task Force, presently assigned to the Sacramento Internet Crimes Against Children (ICAC) Task Force and have reason to believe that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location):

A hard drive booked under Clovis Police Department Report No. 09-312, as DD-105, and an AB-1 Acer X1301 computer, serial number BTSCM0Z037005054093000, both CURRENTLY LOCATED AT the Evidence Room of the Sacramento Valley Hi Tech Crimes Task Force (SVHTCTF), 3720 Dudley Drive, McClellan, CA 95652

in the _____**EASTERN**_____ District of _____**CALIFORNIA**_____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

### SEE ATTACHMENT B, attached hereto and incorporated by reference

which is (state one or more bases for search and seizure set forth under Rule 41(b) of THE Federal Rules of Criminal Procedure)

### property that constitutes evidence, fruits, and/or instrumentality of a criminal offense

concerning violations of Title 18 United States Code, Section 2251(a)-(c), 2252(a)(2), and 2252(a)(4)(B).

The facts to support a finding of probable cause are as follows:

### SEE AFFIDAVIT, attached hereto and incorporated by reference.

Continued on the attached sheet and made a part hereof.      ☒Yes ☐No

_____
Signature of Affiant

Sworn to before me and subscribed in my presence,

_7/21/15  3:00 pm_      at _Sacramento, California_
Date                                                    City       State

_____
Signature of Judge

Allison Claire, U.S. Magistrate Judge

1  BENJAMIN B. WAGNER
   United States Attorney
2  SHELLEY D. WEGER
   Assistant United States Attorney
3  501 I Street, Suite 10-100
   Sacramento, CA 95814
4  Telephone: (916) 554-2700
   Facsimile: (916) 554-2900
5

6  Attorneys for Plaintiff
   United States of America
7

8                IN THE UNITED STATES DISTRICT COURT

9                  EASTERN DISTRICT OF CALIFORNIA

10

11  In the Matter of the Search of:              CASE NO.

12  A hard drive booked under Clovis Police      AFFIDAVIT IN SUPPORT OF AN APPLICATION
    Department Report No. 09-312, as DD-105, and UNDER RULE 41 FOR A WARRANT TO
13  an AB-1 Acer X1301 computer, serial number   SEARCH DEVICES
    BTSCM0Z037005054093000, both
14  CURRENTLY LOCATED AT the Evidence
    Room of the Sacramento Valley Hi Tech
15  Crimes Task Force (SVHTCTF), 3720 Dudley
    Drive, McClellan, CA 95652
16

17

18       1.    I, CHRISTIE HIROTA, being first duly sworn, hereby depose and state as follows:

19                   **INTRODUCTION AND AGENT BACKGROUND**

20       2.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of

21  Criminal Procedure for a search warrant authorizing the examination of two electronic devices,

22  described in Attachment A, which are currently in law enforcement possession, and the extraction

23  from those devices of electronically stored information described in Attachment B.

24       3.    I am a Detective with the Sacramento Valley Hi Tech Crimes Task Force, presently

25  assigned to the Sacramento Internet Crimes Against Children (ICAC) Task Force. I have been

26  assigned to the Sacramento ICAC Task Force since January 2013. I have been employed by the

27  Sacramento County Sheriff's Department since January 2002. In September 2013, I was cross

28  designated as a Special Deputy United States Marshal. As part of my daily duties as a Detective, I

AFFIDAVIT                              1

1 investigate criminal violations relating to child exploitation and Child Pornography including

2 violations pertaining to the illegal production, distribution, receipt and possession of child

3 pornography, in violation of 18 U.S.C. §§ 2251 and 2252.

4   4. I have received training in the area of Child Pornography and child exploitation and as

5 part of my duties have observed and reviewed numerous examples of Child Pornography and visual

6 depictions of minors engaged in sexually explicit conduct (as defined in 18 U.S.C. § 2256) in all forms

7 of media, including computer media. I have attended numerous courses in the investigation of child

8 sexual exploitation, Child Pornography, and online child sexual exploitation. In the course of my

9 duties I have been the investigating officer and Affiant of over 10 applications for search warrants

10 relating to Child Pornography investigations. In addition, I have also provided instruction to both law

11 enforcement and civilians in the area of Internet security, online child exploitation, as well as, social

12 networking sites. I have received training in the areas of computers and computer forensics and I also

13 have a certificate from the Robert Presley Institute of Criminal Investigation.

14   5. The purpose of this application is to search for evidence of violations of:

15     (1) 18 U.S.C. § 2251 (a)-(c), which makes it a crime to employ, use,

16      persuade, induce, entice, or coerce any minor to engage in, any sexually

17      explicit conduct for the purpose of producing any visual depiction of such

18      conduct or for the purpose of transmitting a live visual depiction of such

19      conduct if such person knows or has reason to know that such visual

20      depiction will be transported or transmitted using any means or facility of

21      interstate or foreign commerce or in or affecting interstate or foreign

22      commerce or mailed, if that visual depiction was produced or transmitted

23      using materials that have been mailed, shipped, or transported in or

24      affecting interstate or foreign commerce by any means, including by

25      computer, or if such visual depiction has actually been transported or

26      transmitted using any means or facility of interstate or foreign commerce

27      or in or affecting interstate or foreign commerce or mailed;

28     (2) 18 U.S.C. § 2252(a)(4)(B), which makes it a crime to knowingly

possess matter containing any visual depiction that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct, and such visual depiction was of such conduct; and

(3)    18 U.S.C. §§ 2252(a)(2), which makes it a crime to knowingly receive or distribute any visual depiction using any means or facility of interstate or foreign commerce, or that has been mailed, or shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed, shipped or transported in interstate or foreign commerce, by any means including by computer, where the producing of such visual depiction involved the use of a minor engaging in sexually explicit conduct, and such visual depiction was of such conduct.

6.    I am familiar with the information contained in this Affidavit based upon my observations and investigation, as well as, my training and experience; the observations of other law enforcement officers; my review of official police reports; my discussions with other investigating officers and agents; and my conversations with law enforcement officers who have engaged in numerous investigations involving Child Pornography.

7.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8.    The property to be searched consists of two electronic devices that are identified in Attachment A and herein as follows: (1) a hard drive that was originally booked under Clovis Police Department Report No. 09-312, as DD-105, hereinafter the "Device 1," and (2) an AB-1 Acer X1301

1   computer, serial number BTSCM0Z037005054093000, seized from a residence on Arnold Drive in

2   Rocklin, California, during a probation search of KESHAVA BRAEGER ("Device 2").  Both Device

3   1 and Device 2 ("Devices") are currently located the Evidence Room of the Sacramento Valley Hi

4   Tech Crimes Task Force (SVHTCTF), 3720 Dudley Drive, McClellan, CA 95652.

5       5.      The Devices are encrypted and to date, law enforcement has been unable to break the

6   encryption to review the contents.  The applied-for warrant would authorize law enforcement including,

7   the Federal Bureau of Investigations, to make further attempts to break the encryption and would further

8   authorize forensic examination of the Devices for the purpose of identifying electronically stored data

9   particularly described in Attachment B.

10                              **DEFINITIONS**

11      9.      "Child Pornography" includes the definition found at 18 U.S.C. § 2256(8), and is any

12  visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved

13  the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image,

14  computer image, or computer generated image that is, or is indistinguishable from, that of a minor

15  engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified

16  to appear that an identifiable minor is engaged in sexually explicit conduct.

17      10.     As used in this affidavit, "child erotica" means materials or items that are sexually

18  arousing to certain individuals but that are not in and of themselves obscene or do not necessarily depict

19  minors in sexually explicit poses or positions.  Such material may include non-sexually explicit

20  photographs (such as minors depicted in undergarments in department store catalogs or advertising

21  circulars), drawings, or sketches, written descriptions/stories, or journals.

22      11.     "Visual depictions" include undeveloped film and videotape, and data stored on computer

23  disk or by electronic means, which is capable of conversion into a visual image.  *See* 18 U.S.C.

24  § 2256(5).

25      12.     "Minor" means any person under the age of eighteen years.  *See* 18 U.S.C. § 2256(1).

26      13.     "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including

27  genital, oral genital, genital-anal, or oral anal, whether between persons of the same or opposite sex; (b)

28  bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals

AFFIDAVIT                                    4

1 | or pubic area of any persons. *See* 18 U.S.C. § 2256(2).

2 | **TECHNICAL TERMS**

3 |      14.    As part of my training, I have become familiar with the Internet (also commonly known

4 | as the World Wide Web), which is a global network of computers[1] and other electronic devices that

5 | communicate with each other using various means, including standard telephone lines, high-speed

6 | telecommunications links (e.g., copper and fiber optic cable), and wireless transmissions including

7 | satellite. Due to the structure of the Internet, connections between computers on the Internet routinely

8 | cross state and international borders, even when the computers communicating with each other are in the

9 | same state. Individuals and entities use the Internet to gain access to a wide variety of information; to

10 | send information to, and receive information from, other individuals; to conduct commercial

11 | transactions; and to communicate via electronic mail ("e-mail"). An individual who wants to use

12 | Internet e-mail must first obtain an account with a computer that is linked to the Internet (through a

13 | university, an employer, or a commercial service such as an "Internet Service Provider" or "ISP" [see

14 | definition of "Internet Service Provider" below]). Once the individual has accessed the Internet, that

15 | individual can use Internet mail services, including sending and receiving e-mail. In addition, the

16 | individual can visit web sites (see definition of "web sites" below), and make purchases on the web

17 | sites.

18 |      15.    Set forth below are some definitions of technical terms, used throughout this Affidavit,

19 | and in Attachments A and B hereto, pertaining to the Internet and computers more generally.

20 |           a.  Client/Server Computing: Computers on the Internet are identified by the type of

21 |               function they perform. A computer that provides resources for other computers

22 |               on the Internet is known as a server. Servers are known by the types of service

23 |               they provide; that is, how they are configured. For example, a web server is a

24 |               machine that is configured to provide web pages to other computers requesting

25 |

26 |      [1]  The term "computer" is defined by 18 U.S.C. § 1030 (e) (1) to mean "an electronic, magnetic,

27 | optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or

28 | operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device."

them. A client computer is a computer on the Internet that is configured to request information from a server configured to perform a particular function. For example, if a computer is configured to browse web pages and has web page browsing software installed, it is considered a web client.

b. <u>Compressed file</u>: A file that has been reduced in size through a compression algorithm to save disk space. The act of compressing a file will make·it unreadable to most programs until the file is uncompressed.

c. <u>Computer system and related peripherals, and computer media</u>: As used in this Affidavit, the terms "computer system and related peripherals, and computer media" refer to tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drives and other computer-related operation equipment, digital cameras, scanners, in addition to computer photographs, and other visual depictions of such Graphic Interchange formats, including but not limited to, JPG, GIF, TIF, AVI, and MPEG.

d. <u>Digital device</u>: includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes, and memory chips; and security devices.

e. <u>Domain Name</u>: Domain names are common, easy to remember names associated with an Internet Protocol address (defined below). For example, a domain name of "<u>www.usdoj.gov</u>" refers to the Internet Protocol address of 149.101.1.32.

f.  Hash value: A mathematical algorithm generated against data to produce a numeric value that is representative of that data. A hash value may be run on media to find the precise data from which the value was generated. Hash values cannot be used to find other data.

g.  Image or copy: An accurate reproduction of information contained on an original physical item, independent of the electronic storage device. "Imaging" or "copying" maintains contents, but attributes may change during the reproduction.

h.  Internet Service Providers (ISPs) and the Storage of ISP Records: Internet Service Providers are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, that the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and personal password. ISPs maintain records ("ISP records") pertaining to their subscribers (regardless of whether those subscribers are individuals or entities). These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e-mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format

and in written or printed record format.  ISPs reserve and/or maintain computer disk storage space on their computer system for their subscribers' use. This service by ISPs allows for both temporary and long-term storage of electronic communications and many other types of electronic data and files.  Typically, e-mail that has not been opened by an ISP customer is stored temporarily by an ISP incident to the transmission of that e-mail to the intended recipient, usually within an area known as the home directory. Such temporary, incidental storage is defined by statute as "electronic storage." *See* 18 U.S.C. § 2510 (15). A service provider that is available to the public and provides storage facilities after an electronic communication has been transmitted and opened by the recipient, or provides other long-term storage services to the public for electronic data and files, is defined by statute as providing a "remote computing service." *See* 18 U.S.C. § 2711(2).

i.   Internet Protocol Address (IP address): Every computer or device on the Internet is referenced by a unique Internet Protocol address the same way every telephone has a unique telephone number. An IP address is a series of four numbers separated by a period, and each number is a whole number between 0 and 254. An example of an IP address is 192.168.10.102. Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address.  A central authority provides each ISP a limited block of IP addresses for use by that ISP's customers or subscribers. Most ISP's employ dynamic IP addressing, that is they allocate any unused IP addresses at the time of initiation of an Internet session each time a customer or subscriber accesses the Internet. A dynamic IP address is reserved by an ISP to be shared among a group of computers over a period of time.  The ISP logs the date, time, and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records.  Typically, users who sporadically access the Internet via a dial-up modem will be assigned an IP address from a pool of IP

addresses for the duration of each dial up session. Once the session ends, the IP address is available for the next dial up customer. On the other hand, some ISP's, including most cable providers, employ static IP addressing, that is a customer or subscriber's computer is assigned one IP address that is used to identify each and every Internet session initiated through that computer. In other words, a static IP address is an IP address that does not change over a period of time and is typically assigned to a specific computer.

j. <u>Log file</u>: Log files are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events including remote access, file transfers, logon/logoff times, and system errors. Logs are often named based on the types of information they contain. For example, web logs contain specific information about when a Web site was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

k. <u>Malicious Software ("malware")</u>: Software designed to infiltrate a computer without the owner's informed consent. The expression is a general term used by computer professionals to mean a variety of forms of hostile, intrusive, or annoying software or program code. Software is considered malware based on the perceived intent of the creator rather than any particular features. Malware includes computer viruses, worms, trojan horses, most rootkits, spyware, dishonest adware, crimeware, and other malicious and unwanted software.

l. <u>Metadata</u>: Data contained in a file that is not usually associated with the content of a file but is often associated with the properties of the application or device that created that file. For example, a digital camera photograph often has hidden data that contains information identifying the camera that manufactured it and the date the image was taken.

m. Steganography: Art and science of communicating in a way that hides the existence of the communication.  It is used to hide a file inside another.  For example, a Child Pornography image can be hidden inside another graphic image file, audio file, or other file format.

n. Trace Route: A trace route is an Internet debugging tool used to document the list of inter-connected computers between two computers on the Internet. A trace route will list the names and IP addresses of computers that provide the physical link between two computers on the Internet. Trace routes are useful tools to help geographically identify where a computer on the Internet is physically located, and usually includes information about the registered owner of computers on the Internet.

o. Uniform Resource Locator (URL): The address of a resource or file located on the Internet, also called a "domain name".

p. Web site Hosting: Web site hosting provides the equipment and services required to host and maintain files for one or more web sites and to provide rapid Internet connections to those web sites.  Most hosting is "shared," which means that multiple web sites of unrelated companies are on the same server in order to reduce associated costs.  When a client develops a Web site, the client needs a server and perhaps a web hosting company to host it. "Dedicated hosting" means that the web hosting company provides all of the equipment and assumes all of the responsibility for technical support and maintenance of a Web site. "Co-location" means a server is located at a dedicated hosting facility designed with special resources, such as a secure cage, regulated power, a dedicated Internet connection, online security and online technical support . Co-location facilities offer customers a secure place to physically house their hardware and equipment as opposed to keeping it in their offices or warehouses, where the potential for fire, theft, or vandalism is greater.

**Computers and Child Pornography**

16.     Based upon my knowledge, training, and experience in child exploitation and Child Pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, computers and computer technology have revolutionized the way in which Child Pornography is produced, distributed and utilized.  Prior to the advent of computers and the Internet, Child Pornography was produced using cameras and film, resulting in either still photographs or movies.  The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images.  As a result, there were definable costs involved with the production of pornographic images.  To distribute these images on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public.  The distribution of these wares was accomplished through a combination of personal contacts, mailings, and telephone calls, and compensation for these wares would follow the same paths. More recently, through the use of computers and the Internet, distributors of Child Pornography use membership-based/subscription-based web sites to conduct business, allowing them to remain relatively anonymous.

17.     In addition, based upon my own knowledge, training, and experience in child exploitation and Child Pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, the development of computers has also revolutionized the way in which Child Pornography collectors interact with, and sexually exploit, children.  Computers serve four basic functions in connection with Child Pornography: production, communication and distribution, and storage.  More specifically, the development of computers has changed the methods used by Child Pornography collectors in these ways:

a)     Production: Producers of Child Pornography can now produce both still and moving images directly from a common video or digital camera.  The camera is attached, using a device such as a cable, or digital images are often uploaded from the camera's memory card, directly to the computer.  Images can then be stored, manipulated, transferred, or printed directly from the computer.  Images can be edited in ways similar to how a photograph may be altered.  Images can be lightened, darkened, cropped, or otherwise manipulated.  The producers of Child

Pornography can also use a device known as a scanner to transfer photographs into a computer-readable format. As a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute Child Pornography.  In addition, there is an added benefit to the pornographer in that this method of production does not leave as large a trail for law enforcement to follow.

b)      Communication and Distribution:  The Internet allows any computer to connect to another computer.  By connecting to a host computer, electronic contact can be made to literally millions of computers around the world. In addition, the Internet allows users, while still maintaining anonymity, to easily locate (i) other individuals with similar interests in Child Pornography; and (ii) web sites that offer images of Child Pornography. Child Pornography collectors can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other and to distribute Child Pornography.  These communication links allow contacts around the world as easily as calling next door.  Additionally, these communications can be quick, relatively secure, and as anonymous as desired.  All of these advantages, which promote anonymity for both the distributor and recipient, are well known and are the foundation of transactions between Child Pornography collectors over the Internet.  Sometimes the only way to identify both parties and verify the transportation of Child Pornography over the Internet is to examine the recipient's computer, including the Internet history and cache[2] to look for "footprints" of the web sites and images accessed by the recipient.

c)      Storage:  The computer's capability to store images in digital form makes it an ideal repository for Child Pornography.  A single floppy disk can store dozens of images and hundreds of pages of text.  The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years.  Hard drives with the capacity of 80 gigabytes are not uncommon.  These drives can store thousands of images at

---

[2] "Cache" refers to text, image and graphic files sent to and temporarily stored by a user's computer from a web site accessed by the user in order to allow the user speedier access to and interaction with that web site.

1    very high resolution. Magnetic storage located in host computers adds another dimension to the

2    equation. It is possible to use a video camera to capture an image, process that image in a

3    computer with a video capture board, and save that image to storage in another country. Once

4    this is done, there is no readily apparent evidence at the "scene of the crime." Only with careful

5    laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

6    **CHARACTERISTICS COMMON TO PERSONS WHO DOWNLOAD, PRODUCE,**

7    **DISTRIBUTE AND POSSESS CHILD PORNOGRAPHY**

8    18.    Based upon my own knowledge, experience, and training in child exploitation and Child

9    Pornography investigations, and the training and experience of other law enforcement officers with

10   whom I have had discussions, there are certain characteristics common to individuals involved in the

11   receipt, production and collection of Child Pornography:

12          a.  Child Pornography collectors may receive sexual gratification, stimulation, and

13              satisfaction from contact with children; or from fantasies they may have viewing

14              children engaged in sexual activity or in sexually suggestive poses, such as in person,

15              in photographs, or other visual media; or from literature describing such activity.

            b.  Collectors of Child Pornography may collect sexually explicit or suggestive

16              materials, in a variety of media, including photographs, magazines, motion pictures,

17              videotapes, books, slides and/or drawings or other visual media. Child Pornography

18              collectors oftentimes use these materials for their own sexual arousal and

19              gratification. Further, they may use these materials to lower the inhibitions of

20              children they are attempting to seduce, to arouse the selected child partner, or to

21              demonstrate the desired sexual acts.

            c.  Collectors of Child Pornography almost always possess and maintain their "hard

22              copies" of Child Pornography material, that is, their pictures, films, video tapes,

23              magazines, negatives, photographs, correspondence, mailing lists, books, tape

24              recordings, etc., in the privacy and security of their home or some other secure

25              location. Child Pornography collectors typically retain pictures, films, photographs,

26              negatives, magazines, correspondence, books, tape recordings, mailing lists, child

27              erotica, and videotapes for many years.

28

AFFIDAVIT                                    13

d. Likewise, collectors of Child Pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the collector to view the collection, which is valued highly.

e. Child Pornography collectors also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other Child Pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in Child Pornography.

f. Collectors of Child Pornography prefer not to be without their Child Pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of Child Pornography throughout the world.

## BACKGROUND

19. On approximately April 1, 2014, I was contacted by Sacramento County Deputy District Attorney (DDA) Jeff Harry to provide assistance with a Child Pornography case involving KESHAVA BRAEGER.

20. DDA Harry provided me with BRAEGER'S identifying information. The Sacramento County Known Persons System (KPF) indicated that KESHAVA BRAEGER with a birthdate of XX/XX/1972, lived at an address on Longford Drive in Citrus Heights, CA, and was on formal searchable probation until 11/6/2014 for violating California Penal Code (PC) 261.5 (D) (Sexual Intercourse With Minor Under 16 Years Of Age), and further indicated that he was a 290 sex offender registrant.

21. BRAEGER was on probation for a conviction out of Fresno County. Pursuant to a Fresno County Court minute order, the terms of BRAEGER's probation included the following condition: "Submit to search and seizure of your person, residence, vehicle or any property under your control at any time of the day or night by any law enforcement or probation officer with or without a warrant, and with or without reasonable cause or reasonable suspicion." BRAEGER's probation was transferred to Sacramento County in approximately April 2013. In addition to being on probation,

1   new criminal charges were pending against BRAEGER for violating section 311.11(a) (Possession of

2   Child Pornography) and section 311.4 (c) (Posing/Modeling of a child for Child Pornography) of the

3   California Penal Code, and he was out on bond. *See* Sacramento Superior Court No. 12F04271 and

4   Clovis Police Department 09-312.  The facts underlying these criminal cases are discussed in more

5   detail below.

6   I.   **DEVICE 1**

7       22.   I learned the following information from official reports and my conversations with other

8   law enforcement officers concerning the events leading up to my contact with DDA Harry.

9       23.   In 2009, Corporal Dustin Dodd of the Clovis Police Department was assigned as a

10  Detective to conduct a follow-up investigation regarding a report of an adult male, KESHAVA

11  BRAEGER, annoying or molesting a minor, V1 (DOB XX/XX/1993).

12      24.   V1 had previously reported to Clovis Police Department that BRAEGER was the

13  boyfriend of her friend's (V2) older sister.  V1 knew BRAEGER because V1 spent a lot of time at

14  V2's house, and therefore, saw BRAEGER on numerous occasions.  BRAEGER would talk to V1

15  about various subjects such as school and relationships.

16      25.   In approximately October 2008, V1 had problems with her cell phone.  BRAEGER tried

17  to help fix V1's cell phone, and while doing this obtained her phone number.  BRAEGER began

18  texting V1.  In approximately November 2008, BRAEGER took V1 out to eat a couple of times, and

19  took her to the mall to buy her clothing.

20      26.   V1 reported that in December 2008, she went to her friend V2's house, BRAEGER was

21  there, and BRAEGER made several statements about wanting to grab her buttocks.  She felt

22  uncomfortable and left.

23      27.   V1 further reported, that after that incident BRAEGER continued to text V1.  V1

24  responded to some of BRAEGER'S texts, but became uncomfortable when the texts changed to a

25  sexual nature, including inquiries about whether V1 would ever kiss or spend the night with

26  BRAEGER.  V1 advised BRAEGER to stop contacting her.  BRAEGER continued to send V1 text

27  messages, and V1 filed a complaint with the Clovis Police Department, case no. 09-00153.

28      28.   On 1/08/2009, V1 received a text message from telephone number XXX-XXX-3513.

AFFIDAVIT                                    15

The person identified himself as "Adam," a friend of a friend. V1 and "Adam" exchanged text messages over the following couple of days and exchanged email addresses. The email address "Adam" provided was adampolson17@yahoo.com.

29. "Adam" sent V1 pictures of a teenage boy, including one with no shirt, that according to "Adam" were pictures of himself. "Adam" asked V1 to send him pictures. V1 sent pictures of herself in her bra and underwear.

30. "Adam" then asked V1 if she would like to meet at Red Robin. V1 agreed, and went to meet "Adam" at the Red Robin restaurant on 1/9/09. When V1 arrived at the Red Robin, "Adam" was not there. BRAEGER was there, however, and approached V1. V1 told BRAEGER to go away, ran out of the restaurant, and V1 and her mom made a second report to the Clovis Police Department, case no. 09-00312.

31. On 1/9/09, Officer Herrick of the Clovis Police Department contacted BRAEGER by telephone. BRAEGER admitted seeing V1 at the Red Robin, but denied inviting V1 to meet him there. BRAEGER did, however, admit to sending V1 emails from the email address adampolsen17@yahoo.com, and admitted to posing as "Adam" so that he could have contact with V1.

32. V1's mother informed Corporal Dodd that on 1/13/09, Child Protective Services contacted her at her residence. The CPS workers indicated that they had received an anonymous tip that she was "beating" V1 and that V1 was "sneaking out of the house and getting gangbanged." V1's mother further stated that V1 had recently told her that BRAEGER threatened V1 stating that if V1 did not have sex with him he would call CPS to make a report about her mother.

33. On January 15, 2009, a State of California search warrant was served on Yahoo! Yahoo! responded on January 23, 2009 with information showing that on 1/7/09, images of "Adam" were sent from the email account kbraeger@gmail.com to adampolson17@yahoo.com, and then forwarded to V1's email address, via IP address 149.136.17.253. On that date, that IP address was registered to the California Department of Transportation, BRAEGER's employer.

34. The last login to the Yahoo! server for the adampolson17@yahoo.com email account was on 1/12/09 from the IP address 67.161.177.57. This IP address was assigned to Comcast.

35. On 1/27/09, a State of California search warrant was served on Comcast. On 2/10/09,

16

Comcast provided information in response to the search warrant showing that IP address 67.161.177.57 was assigned to BRAEGER's neighbor at an address on Goldenwood Circle in Sacramento, California.

36.    On 2/4/09, Detective Dodd served a State of California search warrant on the Fresno County Department of Children and Family Services. In response, he learned that the anonymous tip concerning V1 was sent from IP address 67.161.177.57, the same IP address that last accessed the adampolson17@yahoo.com email account and, which was registered to BRAEGER's neighbor.

37.    On 2/13/09, a state of California search warrant was served at BRAEGER's residence, on Goldenwood Circle in Sacramento, California. The warrant authorized, in relevant part, the search of BRAEGER and his residence for evidence of BRAEGER's communications with, and harassment of, V1. BRAEGER was present and answered the door. BRAEGER was Mirandized.

38.    Clovis Police Detectives located several computers, cellular phones and data storage devices inside the residence. These devices were ultimately seized by law enforcement. One device was a desktop computer (Item no. DD108) that had attached to it a separate hard drive (Item no. DD105, DEVICE 1). The desktop computer was on but the screen was locked. The attached hard drive, Device 1, was making continuous noises that are consistent with files be accessed, modified, or written.

39.    BRAEGER initially refused to provide the password to unlock the desktop computer, but later volunteered to type in the password to unlock the desktop. Once unlocked, the desktop displayed a notification that the "TrueCrypt Volume Creation Wizard" had finished and that it had created a "newly created TrueCrypt volume." TrueCrypt is a software program that encrypts all or part of a hard drive. It requires a password to be entered before the computer will decrypt the encrypted information to make the data accessible by the user. BRAGER would not provide the password or comment on what had been encrypted.

40.    BREAGER's desktop, DD108, had the following peer-to-peer icons: Bearshare, Limewire, Kazaa, and BitTorrent. Based on my training and experience, I know that these four programs are frequently used by individuals who download or share Child Pornography. These programs allow one user to directly connect their computer to another user's computer and directly

1  download images from one computer to another.

2      41.   A forensic examination revealed that Device 1 was separated into two partitions. All data

3  on both partitions was completely encrypted. Law enforcement was unable to view the contents of

4  Device 1 due to the encryption.

5      42.   Detective Dodd examined another hard drive seized during the search (DD106) and

6  found a photo of a shirtless female who was approximately 12 to 14 years posing in a model like pose.

7  Embedded in the upper right hand corner of the image was the title "Ukranian Nymphetes." Based on

8  my experience and conversations with other investigators, I know that the website "Ukranian

9  Nymphetes" distributes images of prepubescent and pubescent minors engaged in various sexual

10  activities from posing nude to sexual intercourse and sodomy. Detective Dodd stopped his search, and

11  on 4/2/09, and obtained another State of California search warrant authorizing the seized devices to be

12  searched for images of Child Sexual Exploitation.

13      43.   Continued forensic examination of DD106, identified:

14          a)   over 3,000 images of child erotica;

15          b)   65 graphically nude images of a female estimated to be between approximately 12

16          to 14 years old. Each of the images was embedded with the title "Ukrainian Nymphetes"

17          and was part of a series where the minor undresses and poses in various nude sexually

18          suggestive poses.; and

19          c)   a movie file depicting 20-30 images of minor females, ranging in age from

20          approximately 6 to 16 years old, fully nude, performing calisthenics and various machine

21          assisted workouts. The film focuses on the minor's breasts and full frontal nudity.

22      44.   DD106 also contained peer-to-peer software Limewire. Some of the search terms used

23  were "porn Lolita," "13 lil," "sex preteen," "vibrator Lolita," and "film teens."

24      45.   A forensic examination of DD108, the desktop computer that was encrypting Device 1,

25  contained:

26          a)   approximately 11 pictures of child erotica and

27          b)   a video of BRAGER's then fiancé's sister, V2. The location and file path of the

28          video was

1    C:\Windows.old\Users\Keshava\Documents\NeroVision\ExportedVideo\lib1.mpg.

2    The video appeared to be a compilation of four separate videos, taken from a video

3    camera or webcam, edited together using the software Nero. The video file indicated that

4    it was created on 03/09/07. At that time, V2 was 13 years old. The video consisted of

5    various clips of V2 in her bedroom changing clothes or dressing after a shower. Some of

6    the images show V2 with full frontal and rear nudity, and other images show V2 in only

7    her bra and or underwear.

8    46.    Since seizing DEVICE 1, law enforcement has been unable to break the encryption, and

9    thus, has been unable to view its contents.

10    47.    Based on the connection history between DEVICE 1 and DD108, which contained the

11    video that BRAEGER created of V2, as well as, images of child erotica, and the fact that the device

12    was being encrypted at the time the search warrant was served, which is one technique that can be

13    used to prevent law enforcement from detecting child pornography, your Affiant believes that

14    DEVICE 1 likely contain Child Pornography.

15    II.    **DEVICE 2**

16    48.    The Sacramento County District Attorney's Office filed charges pursuant to California

17    Penal Code 288.3 and 311.11 against BRAEGER for his conduct toward V1.

18    49.    On **7/14/10** an arrest warrant was issued for BRAEGER, and a Sacramento County judge

19    also signed a search warrant granting Detectives from the Clovis Police Department authority to

20    search BRAEGER's residence on Goldenwood Circle in Sacramento, CA, for additional evidence of

21    victimization of V1 and V2, including the camera that BRAEGER used to produce the video of V2.

22    50.    When the search warrant was served, BRAEGER was home alone. BRAEGER was

23    handcuffed, Mirandized, and ultimately arrested.

24    51.    A search of BRAEGER'S residence revealed three computers. A forensic analysis of an

25    HP Pavilion DV5 laptop computer, which BRAEGER admitted under Miranda warning was his

26    personal computer, revealed a video depicting the sexual exploitation of a child and thousands of

27    images of child erotica. The device also contained multiple images depicting the sexual exploitation

28    of a known child pornography victim, "Sandra."

52.   On 8/17/2010, Detective Dodd received a call from V1's mother, who reported that upon learning of BRAEGER's arrest, V1 reported that BRAEGER had raped V1 in November or December 2008. V1 stated that she did not previously report the rape to police because BRAEGER had made a report to CPS and she was afraid of what BRAEGER might do to her and her family. Once BRAEGER was in custody, V1 reported everything to her mother.

53.   On October 5, 2011, BRAEGER was charged with California Penal Code 261(a)(2). On October 7, 2011, BRAEGER pled guilty to CA PC 261.5. BRAEGER was sentenced to one year in jail and upon his release was required to register as a sex offender.

54.   . After being contacted by DDA Harry in April 2014, I decided to conduct a probation search of BRAEGER. BRAEGER had a scheduled probation appointment on 4/15/2014. I asked Probation Officer Turner to detain BRAEGER once he arrived at his office until task force members arrived at BRAGER'S residence.

55.   On 4/15/2014, SVHTCTF members went to BRAEGER's residence, which was located on LONGFORD DR in CITRUS HEIGHTS, CALIFORNIA in preparation for a probation search.

56.   Probation Officer Dornan and Detective Hidalgo made contact with BRAEGER when he arrived for his scheduled appointment at the Sacramento County Probation Office. BRAEGER was detained and handcuffed. BRAEGER's Nokia cellphone, number XXX-XXX-0739, was taken and placed in airplane mode. BRAEGER provided the password to Probation Officer Dornan and Detective Hidalgo. BRAEGER was transported to his residence.

57.   SVHTCTF members searched the residence while I spoke to BRAEGER. BRAEGER stated, in relevant part, that he lived alone at the residence on Longford Drive in Citrus Heights, CA. He further stated that he did not have any computers anywhere and did not own any computers. He stated that he used the library computers up the street on Sylvan Road. Task Force members did not locate any computer devices in BRAEGER's Longford Drive residence.

58.   BRAGER further stated that he had been driving his girlfriend W1's car and that his truck was parked at W1's residence on Arnold Drive in Rockland, CA. BRAEGER also stated that W1 had a young son.

59.   I contacted W1 who stated that she has an 8 year old son and has part-time custody. She

1   indicated that she calls BRAEGER "Kesh" or "John." She stated that she has never seen BRAEGER
2   with a computer at his house, but that he might have one in his truck. She stated that she lives partly at
3   her aunt's house in Roseville, California and with a friend in Rocklin, California. The friend that she
4   lives with has an 11 year old daughter.

5   60.     I asked BRAEGER if he knew what "Cloud Storage" or "SkyDrive" was, he said, "No."

6   a)      I reviewed the cell phone BRAEGER had with him when he arrived at the probation
7   office. I entered the password BRAEGER provided and immediately noticed the words
8   "SkyDrive" flashing on the home screen. "SkyDrive" is a file hosting service which provides
9   users a place to upload and sync files to cloud storage. I did not view any files in "SkyDrive" as
10  the phone was in airplane mode.

11  b)      I manually reviewed the images on BRAEGER's cell phone to determine if there were
12  any images of Child Pornography. I identified a number of sexually implicit images that
13  appeared to be of adults.

14  c)      On the cell phone home screen, The Weather Channel was set to "Rocklin, CA," the city
15  in which W1 resided with her friend.

16  d)      I continued to review the cellphone and observed the following cell phone information,
17  which indicated that the phone belonged to BRAEGER:

18          1.      From the home screen the file path was:

19                  Home Screen---Settings----About----
20                  Phone Information:
21                  Name: Johns
22                  Model: Nokia Lumina 925
23                  Carrier: T – Mobile

24
25          2.      From the home screen the file path I went to was:
                    Home Screen---Photos--- Albums---
26                  There were the following albums labeled:
27                  "Camera Roll from SkyDrive"
28                   "Kesh from SkyDrive"

"Mobile uploads from SkyDrive"

"N8-00 from SkyDrive"

"Saved pictures from SkyDrive"

61.     I contacted BRAEGER's probation officer, who instructed that BRAEGER be arrested because the sexually explicit images violated the terms and conditions of his probation.

62.     Based on information found in W1's car, the vehicle that BRAEGER drove to the probation office, we identified W1's friend's address to be located at a specific address on Arnold Drive in Rocklin, California. I and other law enforcement officers went to W1's friend's address on Arnold Drive in Rocklin, CA, to locate BRAEGER's vehicle and look for any computers. We located a teal Chevrolet extended cab VLN plate number 4V418121 parked approximately 30 yards from the residence that we believed to be W1's friend's residence. A records check revealed the truck was registered to W2 who I knew to be BRAEGER's mother. I peered into the window and could see in plain view a paycheck made payable to Kesava D. Braeger, at his Longford Drive, Citrus Heights, California address.

63.     I used a plastic key card that the probation officer obtained from BRAEGER's wallet to gain entry into the vehicle. No computers were located.

64.     We then went to W1's aunt's residence located on Brennan Circle in Roseville, CA to speak with W1. W1 invited us into her aunt's house and asked us to sit down. W1 confirmed that she lives partially at the Brennan address and partially at an address on Arnold Drive in Rocklin, CA. W1 stated that BRAEGER never comes to her aunt's house because her family does not know that she is dating BRAEGER. W1 stated that the only computer BRAEGER uses is at the Arnold Drive address, and that she would call her friend and ask if law enforcement could look at the computer. W1 further stated that BRAEGER does not stay at the Arnold address in Rocklin, CA, and only visits or spends the night on occasion.

65.     We returned to the Arnold Drive residence and observed W1's car parked in front of the residence. Sergeant Freeworth and I knocked on the door. A female identified as W3 answered the door. W3 stated that she knew that we were coming and invited us in. W3 stepped aside and opened the door. Sergeant Freeworth and I entered and W3 shut the door. W1 was present.

66.     W3 said the computer was upstairs and asked us to follow her.  W1 was sitting in the living room, and she got up and followed behind W3.  Sergeant Freeworth and I followed behind W1.  As we got to the second story landing, there was a common area in the middle with a desk and a desktop computer (an Acer Computer, DEVICE 2) sitting on it.  The monitor was active and I could see the "True Crypt" icon on the desktop.  Based on my training and experience, and my knowledge of BRAEGER, I know that TrueCrypt is encryption software and the same encryption software that BRAEGER used in the past to encrypt DEVICE 1.

67.     I asked who used TrueCrypt and both W1 and W3 said they did not know what it was.

68.     W3 stated the following:

W1 called me at work earlier today about the computer (DEVICE 2), and said the police wanted to take my computer.  I reminded her that the computer was not mine but it was John's (BRAEGER's).  The computer was John's but when W1 and John (BRAEGER) moved from their apartment near the Galleria they brought John's computer to my house.  John, W1 and I have used the computer.  I think W1 is so stressed out that she forgot it was hers.  I do not have to put in a password when I use it; it is generally on when I use it.  I rarely use it, only to check things on the Internet.  I am not sure if my husband and daughter use it.

69.     Detective Beery went downstairs with W1 to obtain more information and to have her sign a consent form to search the computer.  W1 signed a consent form, but said if there was anything illegal on it, specifically Child Pornography, the computer was not hers.

70.     Sergeant Freeworth and I stayed upstairs with the computer until CHP Investigator Vasiliou arrived on scene.

71.     I spoke further with W3, who indicated that her and her husband, W4, own the residence and have an 11-year-old daughter.  W3 indicated that they stay in one room and that W1 and BRAGER stay in another bedroom.  W3 indicated that computer is not hers and that it has never required a password when she has used it.  W3 stated that the computer was BRAEGER's and that he gave it to W1 recently because he did not have a place for it.  She said that W1 and BRAEGER both use the computer, and that she uses it only on occasion.  Finally, W3 provided consent to search her residence.

72.     While Sergeant Freeworth was outside the Arnold Drive residence, W4's boss (W5)

1  pulled up in front of the house. The boss, W5, spontaneously asked Sergeant Freeworth why law

2  enforcement was there, and whether it was because of the "white guy, John." W5 said that BRAEGER

3  was mooching off the family and had been living there for about four months. W5 stated that the family

4  feeds BRAEGER, and that he had had beers and had eaten with BRAEGER several times at the Arnold

5  Drive residence.

6       73.    In a follow-up interview W5 stated that he regularly comes to the Arnold Drive residence

7  and that BRAEGER is always there when he visits. He said he doesn't know much about John

8  (BREAGER), but that he has been living there for about 4 to 5 months. John (BRAEGER) calls W1 his

9  wife. W5 indicated that he was not sure who slept where, but that W4 and W3 have an 11 year old

10 daughter that lives there and that W1 has a young boy who is also sometimes there when John

11 (BRAEGER) is there. W5 stated that John (BRAGER) told him he drives a truck for a living, but is

12 always there when he visits the residence.

13      74.    Once Investigator Vasiliou completed the forensic preview using OSTriage, the OS

14 Triage report provided information about files that had been recently accessed. These files included:

15            1.    Sandra Model Jan '08 Collection.rar

16            2.    Sandra_166.zip

17            3.    Camera Roll

18 The file names with "Sandra" are possibly related to a Child Pornography series that is called by the

19 name "Sandra." Based on my conversations with DDA Harry I know that BRAEGER previously

20 possessed images of child pornography from the "Sandra" series.

21      75.    Investigator Vasiliou was unable to conduct a complete Forensic Examination of

22 DEVICE 2 due to encryption. Because the computer was turned off at the time it was seized and

23 TrueCrypt was installed, BRAEGER'S password is required to access the contents of the hard drive.

24      76.    On April 22, 2014, Probation Officer Donovan and I canvassed W3's block of Arnold

25 Drive in Rocklin, California to speak with neighbors about the frequency with which BRAEGER was

26 at the residence. Neighbors indicated that BRAEGER and or his vehicle was at the Arnold Drive

27 residence approximately 6 to 7 days a week.

28      77.    I contacted Detective S. Hampton from the Sacramento Sexual Assault Felony

1  Enforcement (S.A.F.E.) team concerning BRAEGER's compliance with his 290 registration

2  requirement because it appeared that he was living at the Arnold Drive residence rather than the

3  address at which he was registered. Detective Hampton canvassed the neighborhood surrounding

4  BRAEGER's Longford Drive address, the address BRAEGER identified as his residence pursuant to

5  his 290 registration requirement, and neighbors stated that BRAEGER's vehicle was there only 1 to 2

6  days a week.

7      78.   On April 30, 2014, I received a follow up call from W3 who indicated that BRAEGER

8  was staying at her residence on Arnold Drive address over the weekends and typically for 3 to 4 days

9  at a time.

10     79.   Based on your Affiant's and Detective Hampton's investigation, there is evidence

11  indicating that BRAEGER was primarily residing at W3's residence on Arnold Drive in Rocklin, CA,

12  rather than his registered address on Longford Drive in Citrus Heights, CA, and that DEVICE 2

13  belonged to BRAEGER.

14                **PROBABLE CAUSE TO SEARCH DEVICE 1 AND 2**

15     80.   DEVICE 1:  Based upon the aforementioned factual information, I submit that there is

16  probable cause to believe that there is evidence of violations of 18 U.S.C. §§ 2251 and 2252 on Device

17  1. Images of child pornography were found on several of the devices seized during the 2009 search of

18  BRAEGER's residence. Device 1 was connected to a desktop computer, DD108 that contained

19  images that are likely child pornography, including a video that BRAEGER produced of his then

20  girlfriend's 13-year-old sister (V2). Further, based on my knowledge about the common

21  characteristics of individuals who possess, produce, and distribute child pornography, the fact that

22  BRAEGER was encrypting the contents of DEVICE 1, suggests that BREAGER may be attempting to

23  prevent law enforcement from discovering additional images of child pornography. DEVICE 1 has

24  been in the custody, possession, and control of law enforcement since it was seized on 2/13/09.

25     81.   DEVICE 2:  Based upon the aforementioned factual information, I submit that there is

26  probable cause to believe that there is evidence of violations of 18 U.S.C. §§ 2251 and 2252 on Device

27  2. Specifically, the fact that BRAEGER maintained a computer at Arnold Drive, did not report that

28  address to his probation officer or pursuant to sex offender registration requirements, and then lied to

law enforcement by stating that he did not have a computer and only used a computer at the public library, suggests that BRAEGER is trying to hide his criminal activity. Further, a preliminary search of DEVICE 2 identified file names (*i.e.*, Sandra) that are likely associated with Child Pornography. Based on your Affiant's training and experience, your Affiant believes that BRAEGER was attempting to prevent his probation officer and law enforcement from discovering DEVICE 2 so that he could continue possessing, receiving or distributing Child Pornography.

## III.    ELECTRONIC STORAGE AND FORENSIC ANALYSIS

82.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

83.    There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

a)    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b)    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium that is not currently being used by an active file-for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c)    Wholly apart from user-generated files, computer storage media-in particular, computers' internal hard drives-contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence

AFFIDAVIT                                                 26

can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d)    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

84.   <u>Forensic evidence.</u>  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a)    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b)    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c)    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about

1    how electronic devices were used, the purpose of their use, who used them, and when.

2    d)    The process of identifying the exact electronically stored information on a storage

3    medium that are necessary to draw an accurate conclusion is a dynamic process.

4    Electronic evidence is not always data that can be merely reviewed by a review team and

5    passed along to investigators.  Whether data stored on a computer is evidence may

6    depend on other information stored on the computer and the application of knowledge

7    about how a computer behaves.  Therefore, contextual information necessary to

8    understand other evidence also falls within the scope of the warrant.

9    e)    Further, in finding evidence of how a device was used, the purpose of its use, who used

10   it, and when, sometimes it is necessary to establish that a particular thing is not present on

11   a storage medium.

12   85.   Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the

13   warrant I am applying for would permit the examination of the device consistent with the warrant.

14   The examination may require authorities to employ techniques, including but not limited to computer-

15   assisted scans of the entire medium, that might expose many parts of the device to human inspection in

16   order to determine whether it is evidence described by the warrant.

17   86.   Manner of execution.  Because this warrant seeks only permission to examine a device

18   already in law enforcement's possession, the execution of this warrant does not involve the physical

19   intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize

20   execution of the warrant at any time in the day or night.

21   **IV.    CONCLUSION**

22   87.   I submit that this affidavit supports probable cause for a search warrant authorizing the

23   examination of the Devices described in Attachment A to seek the items described in Attachment B.

24   88.   It is respectfully requested that this Court issue an order sealing, until further order of the

25   Court, all papers submitted in support of this application, including the application and search warrant.

26   I believe that sealing this document is necessary because the warrant is relevant to an ongoing

27   investigation and there may be other targets involved in the exchange of child pornography that will

28   not be searched at this time.  Based upon my training and experience, I have learned that, online

criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, *i.e.*, post them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

CHRISTIE HIROTA
Detective, Sacramento Valley Hi Tech Crimes
Task Force

Subscribed and sworn to before me on:  _7/21/15_

The Honorable Allison Claire
UNITED STATES MAGISTRATE JUDGE

Approved as to form by

AUSA SHELLEY D. WEGER

## ATTACHMENT B:  ITEMS TO BE SEIZED

All records on the Devices described in Attachment A that relate to violations of 18 U.S.C. §§ 2251 (a)-(c), 2252(a)(2), and 2252(a)(4)(B) :

1.  Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

2.  Any child pornography or visual depictions of minors engaged in sexually explicit conduct in any form;

3.  Any child erotica;

4.  Any information pertaining to any individual's interest in child pornography, visual depictions of minors engaged in sexually explicit conduct, or erotica;

5.  Any items, images, documents, communications, records, and information related to the distribution, receipt or possession of child pornography or visual depictions of minors engaged in sexually explicit conduct;

6.  All screen names, user names, and true names of others who may have operated as the source of child pornography or visual depictions of minors engaged in sexually explicit conduct, in any format, downloaded and possessed by the target computer(s);

7.  Any items, images, documents, communications, records, and information pertaining to the possession, receipt, transmission, sale, purchase, trade, or distribution of child pornography or visual depictions of minors engaged in sexually explicit conduct that affected or were transmitted or received via computer, some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail, including:

a. Envelopes, letters, and other correspondence including, electronic mail, chat logs, and electronic or other instant messages, establishing possession, access to, affect on, or transmission through interstate or foreign commerce, including by United States mail or via computer, of child pornography or visual depictions of minors engaged in sexually explicit conduct;

b. Books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind affecting interstate or foreign commerce or involving the transmission via interstate or foreign commerce, including by U.S. mail or by computer, of any child pornography or visual depiction of minors engaged in sexually explicit conduct;

c. Credit card information, including bills and payment information, regarding Internet service; purchase of computer hardware, software, or storage media; purchase of or payment for memberships to web sites; and possession, receipt, sale, purchase, trade, transportation, or distribution of child pornography or visual depictions of minors engaged in sexually explicit conduct;

d. Records evidencing occupancy or ownership of the premises described above, including utility/telephone bills or addressed correspondence; and

e. Records or other items that indicate ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes.

8. Any evidence of the attempted or actual persuasion, inducement, enticement, or coercion of any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense in any form;

9. All screen names, user names, and true names of others who may have accessed any emails identified during the search as having contacted minors;

10. Evidence of who used, owned, or controlled the DEVICES at the time the items described in this warrant were created, edited, viewed, or deleted, such as logs, registry entries, saved user names and passwords, documents, and browsing history, to include bookmarked sites;

11. Evidence of malicious software ("malware");

12. Evidence of the lack of such malicious software;

13. Evidence of the attachment to the DEVICES of other storage devices, disks, CD-ROMS, or similar containers for electronic evidence;

14. Evidence of the times the DECIVES were used;

15. Passwords, encryption keys, and other access devices that may be necessary to access the DEVICES;

16. Evidence identifying the location from which images of child pornography were downloaded, including date and time of such downloads;

17. Evidence identifying whether image and/or video files containing child pornography were ever viewed, to include date and time of such viewing;

18. Evidence identifying whether images and/or videos files were deleted, to include date and time of deletion;

19. Evidence relevant to the creation dates of all visual depictions of minors engaged in sexually explicit conduct, to include evidence derived from metadata obtained from child pornographic videos and images;

20. Contents of volatile memory related to computers and other digital communication devices that would tend to show the current and recent use of the computer, use of encryption, use of other communications devices, routes of Internet and other digital communications traffic and passwords, encryption keys or other dynamic details necessary to preserve the true state of running evidence;

21. Computer software, hardware or digital contents related to the sharing of Internet access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address;

22. Records of Internet Protocol addresses used;

23. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

24. Contextual information necessary to understand the evidence described in this attachment

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

AO 93 (Rev 12/03) Search Warrant

# United States District Court

**EASTERN** _____ District of _____ **CALIFORNIA** _____

In the Matter of the Search of

(Name, address or brief description of person, property or premises to be searched)

A hard drive booked under Clovis Police Department Report No. 09-312, as DD-105, and an AB-1 Acer X1301 computer, serial number BTSCM0Z037005054093000, both CURRENTLY LOCATED AT the Evidence Room of the Sacramento Valley Hi Tech Crimes Task Force (SVHTCTF), 3720 Dudley Drive, McClellan, CA 95652

**SEARCH WARRANT**

CASE NUMBER:

2:15 - SW - 0 4 1 1     AC

TO, CHRISTIE HIROTA and any Authorized Officer of the United States

Affidavit(s) having been made before me by CHRISTIE HIROTA who has reason to believe

that ☐ on the person of, or ☒ on the premises known as (name, description and/or location)

**SEE ATTACHMENT A, attached hereto and incorporated by reference**

in the _____ **EASTERN** _____ District of _____ **CALIFORNIA** _____ there
is now concealed a certain person or property, namely  (describe the person or property to be seized)

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before _____ August 3, 2015 _____
                                                                                           Date
(not to exceed 14 days) the person or place named above for the person or property specified, serving this warrant and making the search ☐ in the daytime — 6:00 AM to 10:00 P.M. ☒ at any time in the day or night as I find reasonable cause has been established and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to any authorized U.S. Magistrate Judge in the Eastern District of California, as required by law.
                          U.S. Magistrate Judge (Rule 41(f)(4))

7/21/15 _____ at _Sacramento, California_ _____
Date and Time Issued                          City and State

_____
Allison Claire, U.S. Magistrate Judge                          Signature of Judge

AO 93 (Rev 12/03) Search Warrant (Reverse)

| | RETURN | | Case Number: | |
|---|---|---|---|---|
| DATE WARRANT RECEIVED | DATE AND TIME WARRANT RECEIVED | | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH | |

INVENTORY MADE IN THE PRESENCE OF

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

## CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____          _____
Signature of Judge                                              Date

## ATTACHMENT A

The devices to be searched are:

(1)     A hard drive booked under Clovis Police Department Report No. 09-312, as DD-105; and

(2)     An AB-1 Acer X1301 computer, Serial Number BTSCM0Z037005054093000, seized during the consent search and probation search of KESHAVA BRAEGER conducted at a residence on Arnold Drive in Rocklin, California.

The Devices are currently located at the Evidence Room of the Sacramento Valley Hi Tech Crimes Task Force (SVHTCTF), 3720 Dudley Drive, McClellan, CA 95652.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B:  ITEMS TO BE SEIZED

All records on the Devices described in Attachment A that relate to violations of 18 U.S.C. §§ 2251 (a)-(c), 2252(a)(2), and 2252(a)(4)(B) :

1. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

2. Any child pornography or visual depictions of minors engaged in sexually explicit conduct in any form;

3. Any child erotica;

4. Any information pertaining to any individual's interest in child pornography, visual depictions of minors engaged in sexually explicit conduct, or erotica;

5. Any items, images, documents, communications, records, and information related to the distribution, receipt or possession of child pornography or visual depictions of minors engaged in sexually explicit conduct;

6. All screen names, user names, and true names of others who may have operated as the source of child pornography or visual depictions of minors engaged in sexually explicit conduct, in any format, downloaded and possessed by the target computer(s);

7. Any items, images, documents, communications, records, and information pertaining to the possession, receipt, transmission, sale, purchase, trade, or distribution of child pornography or visual depictions of minors engaged in sexually explicit conduct that affected or were transmitted or received via computer, some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail, including:

a. Envelopes, letters, and other correspondence including, electronic mail, chat logs, and electronic or other instant messages, establishing possession, access to, affect on, or transmission through interstate or foreign commerce, including by United States mail or via computer, of child pornography or visual depictions of minors engaged in sexually explicit conduct;

b. Books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind affecting interstate or foreign commerce or involving the transmission via interstate or foreign commerce, including by U.S. mail or by computer, of any child pornography or visual depiction of minors engaged in sexually explicit conduct;

c. Credit card information, including bills and payment information, regarding Internet service; purchase of computer hardware, software, or storage media; purchase of or payment for memberships to web sites; and possession, receipt, sale, purchase, trade, transportation, or distribution of child pornography or visual depictions of minors engaged in sexually explicit conduct;

d. Records evidencing occupancy or ownership of the premises described above, including utility/telephone bills or addressed correspondence; and

e. Records or other items that indicate ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes.

8. Any evidence of the attempted or actual persuasion, inducement, enticement, or coercion of any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense in any form;

9. All screen names, user names, and true names of others who may have accessed any emails identified during the search as having contacted minors;

10. Evidence of who used, owned, or controlled the DEVICES at the time the items described in this warrant were created, edited, viewed, or deleted, such as logs, registry entries, saved user names and passwords, documents, and browsing history, to include bookmarked sites;

11. Evidence of malicious software ("malware");

12. Evidence of the lack of such malicious software;

13. Evidence of the attachment to the DEVICES of other storage devices, disks, CD-ROMS, or similar containers for electronic evidence;

14. Evidence of the times the DECIVES were used;

15. Passwords, encryption keys, and other access devices that may be necessary to access the DEVICES;

16. Evidence identifying the location from which images of child pornography were downloaded, including date and time of such downloads;

17. Evidence identifying whether image and/or video files containing child pornography were ever viewed, to include date and time of such viewing;

18. Evidence identifying whether images and/or videos files were deleted, to include date and time of deletion;

19. Evidence relevant to the creation dates of all visual depictions of minors engaged in sexually explicit conduct, to include evidence derived from metadata obtained from child pornographic videos and images;

20. Contents of volatile memory related to computers and other digital communication devices that would tend to show the current and recent use of the computer, use of encryption, use of other communications devices, routes of Internet and other digital communications traffic and passwords, encryption keys or other dynamic details necessary to preserve the true state of running evidence;

21. Computer software, hardware or digital contents related to the sharing of Internet access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address;

22. Records of Internet Protocol addresses used;

23. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

24. Contextual information necessary to understand the evidence described in this attachment

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.